**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

MARK R. KNECE,

        Plaintiff,

                                        Civil Action 2:14-cv-353
      v.                               Judge Algenon L. Marbley
                                       Magistrate Judge Elizabeth P. Deavers

COMMISSIONER OF SOCIAL SECURITY,

        Defendant.

## REPORT AND RECOMMENDATION

Plaintiff, Mark R. Knece, brings this action under 42 U.S.C. §§ 405(g) and 1383(c)(3) for review of a final decision of the Commissioner of Social Security ("Commissioner") denying his applications for Social Security Disability Insurance Benefits and Supplemental Security Income. This matter is before the United States Magistrate Judge for a Report and Recommendation on Plaintiff's Statement of Errors (ECF No. 14), the Commissioner's Memorandum in Opposition (ECF No. 18), Plaintiff's Reply (ECF No. 19), and the administrative record (ECF No. 11). For the reasons that follow, it is **RECOMMENDED** that the Court **REVERSE** the Commissioner of Social Security's nondisability finding and **REMAND** this case to the Commissioner and the ALJ under Sentence Four of § 405(g).

## I.    BACKGROUND

Plaintiff protectively filed his applications for benefits in March 2011, alleging that he has been disabled since February 15, 2011, due to back pain and depression. (R. at 276-82, 310.)

Plaintiff's applications were denied initially and upon reconsideration.  Plaintiff sought a *de novo* hearing before an administrative law judge.  Administrative Law Judge Paul E. Yerian (the "ALJ") held a hearing on September 13, 2012, at which Plaintiff, who was represented by counsel, testified.  (R. at 115–33.)  A vocational expert, Eric W. Pruitt, (the "VE") also testified.  On October 26, 2012, the ALJ issued a decision finding that Plaintiff was not disabled within the meaning of the Social Security Act.  (R. at 86–102.)  On February 26, 2014, the Appeals Council denied Plaintiff's request for review and adopted the ALJ's decision as the Commissioner's final decision.  (R. at 1–6.)  Plaintiff then timely commenced the instant action.

## II.  HEARING TESTIMONY

### A.  Plaintiff's Testimony

Plaintiff was thirty-three years old at the time of the hearing.  (R. at 115.)  He testified that he is divorced, has no children, and lives by himself in a mobile home.  (R. at 116.)  Plaintiff testified that he has his driver's license and typically drives his car about twice a week.  (R. at 117.)  He stated that if he sits in a car for longer than fifteen to twenty minutes he has problems standing up and has pain in his lower back.  (*Id.*)  He explained that he had to get out of his car to stretch during the course of his thirty minute drive to the hearing.  (R. at 117-18.)

Regarding his daily activities, Plaintiff testified that he typically sleeps in because he is depressed and he feels like his life has no meaning.  (R. at 123.)  He stated that it takes him five to ten minutes to get out of bed because of the pain and numbness in his limbs.  (*Id.*)  He testified that he no longer cooks, but will "usually pop [something] in the microwave or throw [it] [o]n the stove."  (R. at 124.)  Plaintiff further testified that after he eats, he usually lies down for a half hour to an hour.  *Id.*  He then spends time playing the guitar, reading in his chair, or using his

laptop computer, which he can use while lying down.  (*Id.*)  He also watches television for a couple hours, and stands up periodically to stretch.  According to Plaintiff, he leaves the house one or two days per week.  (*Id.*)

According to Plaintiff, he cannot do a sit-down job because he has trouble concentrating and focusing on any tasks as a result of his pain.  (R. at 125.)  He rated his pain severity between six and eight on an average day, with ten being "in the emergency room" and zero being "no pain at all."  (R. at 126.)  He also stated that he has numbness and loss of feeling in his lower extremities that causes him to fall on occasion.  (*Id.*)  Plaintiff estimated that he can lift 15-20 pounds without causing himself too much pain and 5-10 pounds on a frequent basis.  He estimated that he can sit up to 30 minutes, stand for no longer than 5-10 minutes, and  walk no longer than a half mile.  (R. at 126-27.)

Plaintiff testified that he sleeps for approximately 5-6 hours each night and that his sleep is interrupted by pain.  (R. at 127-28.)  He stated that it is hard for him to get back to sleep.  (R. at 128.)  He explained that he takes Tylenol PM or other over the counter medicines to help him sleep.  (*Id.*)  Plaintiff stated that he is not currently taking any medications due to lack of insurance, but uses a heating pad 2-3 times per week and a massaging tool to help alleviate his back pain.  (R. at 131.)

Plaintiff testified that he has a "quick temper," is aggravated easily, and has crying episodes.  (R. at 129.)  Plaintiff also stated that he has difficulty dealing with stressful situations, has isolated himself from friends, and only socializes with family.  (*Id.*)  He also testified that he has some difficulty being around groups of people.  (R. at 130.)

3

## B.    Vocational Expert Testimony

The ALJ proposed a series of hypotheticals regarding an individual with Plaintiff's age, education, work experience, and residual functional capacity as assessed by the ALJ.  The VE testified that the hypothetical individual could not perform Plaintiff's past relevant work.  (R. at 136-37.)  He testified, however, that jobs exist in significant numbers that the hypothetical individual could perform, such as an addresser, laminator, and a toggle press folder feeder.  (R. at 137-38.)  When asked whether the hypothetical individual could still perform these jobs if the individual were further limited to a sit/stand option, the VE testified that he could, but the number of jobs available would be reduced.  (R. at 138.)  The VE also testified that if the hypothetical individual would miss one or two days per month due to pain or symptoms of depression, he would not be able to sustain employment.  (R. at 140.)

### III.    MEDICAL RECORDS

## A.    Treatment prior to Date of Disability

X-rays taken in January 2007 of Plaintiff's lumbar spine revealed anterolisthesis of L5 on S1 due to spodylolysis, moderate degenerative disc disease, and loss of disc height at L5/S1.  Plaintiff also had slight retrolisthesis of his L4 on L5 that increased to 7mm with flexion and extension.  (R. at 394.)

On April 2, 2007, Plaintiff consulted with a neurosurgeon, Dr. Yashon.  He complained of low-back pain with radiation down his left leg and some left-leg weakness.  (R. at 386.)  On examination, Dr. Yashon noted tenderness in Plaintiff's lower back.  Based on Plaintiff's January 2007 x-rays, Dr. Yashon recommended that Plaintiff undergo a lumbosacral fusion with instrumentation.  (R. at 387.)  Dr. Yashon noted that Plaintiff did not wish to proceed with

4

surgery at that time.  *Id.*

A May 2007 MRI of Plaintiff's lumbar spine revealed Grade 1 spondylolisthesis of L5 on S1 associated with spondylosis at L5 resulting in a large pseudo bulge and bilateral foraminal encroachment; slight retrolisthesis of L4 on LS; a small pseudo bulge/disc bulge, small disk bulge, and tiny annular rent at L3-4; and no significant spinal canal stenosis.  (R. at 389-90.)

Plaintiff consulted with neurosurgeon, Dr. Kiehm on June 20, 2007, with complaints of increasing back pain, left hip pain, left leg pain, and numbness.  Dr. Kiehm found pain, weakness, some numbness, and tingling.  She assessed spondylolisthesis, lumbar radiculopathy, low back pain, degenerative disc disease, and lumbar spondylosis.  She recommended a trial of physical therapy and epidural steroid injections if physical therapy did not work.  (R. at 446-47.) At a follow-up appointment, Plaintiff indicated that physical therapy did not help him "too much."  (R. at 395.)  She then scheduled Plaintiff for lumbar epidural steroid injections.  *Id.*

An August 22, 2008 MRI of Plaintiff's lumbar spine showed bilateral L5 spondylosis; grade 2 anterolisthesis of L5 on S1; bilateral L5-S1 foraminal stenosis; and no disc herniations. (R. at 430.)  In September 2008, Dr. Kiehm told Plaintiff that he was a candidate for surgery, but noted that he would have back pain for the rest of his life even if he had surgery.  She informed him that the surgery would "get [the pain] knocked down to the point where he can get up and around for more than 15 minutes at a time."  (R. at 441-42.)

On January 26, 2009, Dr. Kiehm performed a L4-S1 laminectomy, L4-S1 segmental posterior fixation, posterolateral fusion L4-L5, and posterolateral fusion L5-S1.  (R. at 448-50.) In March 2009, when seen for his two month post-op appointment, Plaintiff reported that he continued to have back pain and cannot stand for more than 10 minutes.  (R. at 471.)  An x-ray

of Plaintiff's lumbar spine taken on March 2009 showed grade 1 spondylolisthesis of L5 on S1 with loss of disc height.  (R. at 473.)  By May 2009, Dr. Kiehm noted that Plaintiff still had back pain and she prescribed Percocet and physical therapy.  (R. at 472.)

On July 9, 2009, consulting pain specialist, Dr. Blake found paraspinal muscle spasm and increased pain with lumbar facet loading.  Dr. Blake assessed lumbar degenerative disc disease and lumbar spondylosis.  Dr. Blake offered facet injections above his fusion site, but Plaintiff stated that he was not interested and would like to continue with medical management.  (R. at 488-89.)

**B.      Treatment After the Date of Disability**

**1.      Physical Impairments**

**a.      Berger Hospital**

On May 18, 2011, Plaintiff presented to the emergency room after he fell and injured his lower back, left knee, left ankle, and left foot.  (R. at 533.)  An x-ray of Plaintiff's left knee revealed some degenerative osteoarthritis.  (R. at 542.)  An x-ray of Plaintiff's left ankle revealed a small avulsion fracture.  (R. at 751.)  Plaintiff was assessed with a left lumbar strain, left knee sprain, left foot sprain, and placed in an air cast.  (R. at 534.)  Plaintiff was noted to ambulate without assistance upon discharge from the hospital.  (R. at 538.)

In September 2011, Plaintiff went to the emergency room for chronic low back pain.  He reported that he had pain radiating down his left leg.  He was assessed with an acute exacerbation of chronic back pain and depression and given Dilaudid and Valium.  (R. at 663-72.)

On December 10, 2011, Plaintiff again presented to the emergency room for back pain. Plaintiff arrived ambulatory with a steady gait.  (R. at 696.)  Plaintiff was assessed as a fall risk.

6

(R. at 695.)  Treatment notes indicate that when discharged, Plaintiff was ambulatory with assistance.

### b.    Donald Fouts, D.O.

On April 18, 2011, Dr. Fouts reported that he had been treating Plaintiff since February 2007.[1]  Dr. Fouts listed Plaintiff's diagnoses as back pain, lumbar spondylolisthesis, lumbar spondylosis, and depression.  (R. at 497.)  Dr. Fouts reported that Plaintiff's pain and depression continued despite treatment.  (R. at 498.)  He further noted that Plaintiff has lower back paraspinal tenderness, increased pain with range of motion and flexion and extension; decreased range of motion; depressed mood; decreased interest; decreased hope; and poor outlook.  (R. at 497.)  Dr. Fouts noted that Plaintiff has trouble affording medication due to lack of insurance.

Dr. Fouts opined that due to pain and decreased range of motion, Plaintiff is severely limited in his ability to work and has a limited ability to perform activities such as sitting, driving, lifting, carrying, stooping, kneeling, bending, walking for extended periods, and standing for extended periods.  Dr. Fouts further opined that Plaintiff's depression limits his ability to think clearly, concentrate, and interact with others.  Dr. Fouts noted that Plaintiff's depression creates a decreased interest in personal hygiene.  (R. at 498.)

The record contains Dr. Fouts' treatment notes from May 19, 2011 until February 6, 2012.  (R. at 673-89, 700-09, 715-65.)  Examinations during this time generally revealed intact gait, bilateral lower paraspinal muscle tenderness, reduced lumbar flexion, and reduced lumbar extension.  (R. at 722, 725, 729, 732, 735, 738, 741, 762).  Dr. Fouts also noted that Plaintiff had decreased sensation in the right anterior lateral thigh to touch (R. at 735, 738, 756); deep tendon

---

[1]The administrative record contains no treatment notes from Dr. Fouts prior to May 19, 2011.  (*See* ECF No. 11).

reflexes of 3+/4+ bilaterally in the patella and 3+/4+ bilaterally in the achilles (R. at 735, 738, 741, 744, 756, 759, 762, 765); negative straight leg raise bilaterally (R. at 674, 677, 680, 683, 688, 735, 741); positive straight leg raise at 30 degrees on the right on more than one occasion (R. at 759, 756, 765); decreased range of motion (R. at 683, 688, 738, 741); tender lateral left ankle and reduced left knee flexion (R. at 688, 722, 749, 701); and joint line tenderness (R. at 687, 701). Dr. Fouts also noted that Plaintiff appeared depressed. (R. at 737, 740, 747, 755, 759.)

On February 6, 2012, Dr. Fouts completed a Physical Capacity Evaluation on behalf of Plaintiff. He opined that Plaintiff could occasionally lift 5 pounds, and that he could not lift any weight frequently. Dr. Fouts found that Plaintiff could stand and walk less than 30 minutes in an 8-hour workday, and could sit less than 30 minutes in an 8-hour workday. Dr. Fouts noted that Plaintiff could sit 10 to 15 minutes before needing to stand, and could stand 10 to 15 minutes before needing to sit. Dr. Fouts also opined that Plaintiff must lie down 2-4 times in an 8-hour workday. Plaintiff could never twist, stoop, bend, crouch, or climb ladders, and could occasionally climb stairs. Plaintiff could never perform pushing or pulling, could occasionally perform reaching, and could frequently perform handling, fingering, and feeling. Dr. Fouts further opined that Plaintiff needed to avoid even moderate exposure to wetness because he is a fall risk. Dr. Fouts opined that Plaintiff must avoid all exposure to hazards. He also noted that Plaintiff's depression creates problems with his ability to respond appropriately to supervisors, co-workers, and to changes in a routine work setting. Dr. Fouts concluded that Plaintiff could work 0-3 days per week and less than 3 consecutive weeks per month. (R. at 711-13.)

On February 8, 2012, Dr. Fouts prepared a narrative in which he reported that he treated

Plaintiff on a regular basis for pain management both prior and following surgery.  He opined that Plaintiff is severely limited due to his pain and has been unable to work. He further opined that Plaintiff could not sit for more than 1 to 2 hours at a time.  He also noted that Plaintiff has increased pain with activities that require standing for extended periods of time, including doing dishes, laundry, or mowing grass.  Dr. Fouts also submitted that Plaintiff suffers from depression, with suicidal ideation.  Dr. Fouts opined that Plaintiff likely will not obtain significant pain relief from additional surgical procedures.  He concluded that Plaintiff is permanently and totally disabled due to chronic lower back pain and believes Plaintiff is going to require long term pain management in the future.  (R. at 715-16.)

c.     **Robert D. Whitehead, M.D.**

On June 2, 2011, Dr. Whitehead examined Plaintiff for disability purposes.  (R. at 549-57.)  Plaintiff reported an insidious onset of low back pain, with pain radiating into his lower extremities and intermittent numbness throughout his entire body.  (R. at 549.)  On examination, Dr. Whitehead found that Plaintiff walked with a "forward flexed antalgic type gait with a very short swing phase bilaterally."  (R. at 550.)  He further noted that Plaintiff had decreased range of motion throughout the lumbar spine, some midline tenderness, positive straight leg raise bilaterally in the seated position at 40 degrees, altered sensation in the lower extremities on the right in the anterior proximal thigh and lateral proximal thigh and on the left medial ankle and lateral calf, decreased strength in the lower extremity on the left side, and radiculopathy. (R. at 550-51.)  Dr. Whitehead noted that Plaintiff had no palpable spasms in his back; that he is able to heel walk and toe walk; and that he had no clubbing, cyanosis, or edema in his extremities.  An x-ray of Plaintiff's lumbosacral spine showed degenerative disc disease at L5-S1 with near grade

9

2 L5-S1 spondylolisthesis, scoliosis in the dorsolumbar area, and increased lordosis.  (R. at 553.)

Dr. Whitehead concluded that Plaintiff could only take part in sedentary work where he could sit

and stand as needed for comfort.  (R. at 551.)

### d.    Adena Health System

Plaintiff presented to the emergency room on June 3, 2011, complaining of significant

back pain and suicidal thoughts.  (R. at 621.)  Plaintiff reported that he has not been sleeping

well due to the pain, and that his back pain has been under treated.  An MRI of the lumbar spine

taken on June 3, 2011 revealed postsurgical changes and decompressed laminectomies spanning

L4-S1; moderate spinal canal stenosis and mild bilateral neural foraminal narrowing at L3-L4

secondary to grade 1 retrolisthesis of L3 relative to L4; a disc bulge; facet arthropathy and

thickening of the ligamentum flavum; mild to moderate left neural foraminal narrowing at L5-S1

secondary to grade 1 anterolisthesis of L5 relative to S1; and a disc bulge at T11-T12 without

significant spinal canal stenosis.  (R. at 559-60.)

On July 5, 2011, Plaintiff again presented to the emergency room for back and leg pain

after being unable to tolerate an electromyogram.  (R. at 613.)  The emergency room physician

felt that there was some "embellishment going on" and he was concerned that there was mental

health component to Plaintiff's pain.  The physician noted that Plaintiff has spondylolisthesis,

which would generate pain, but "certainly nothing that would make him want to operate."  (R. at

613.)  Plaintiff was administered Valium at the hospital.  (R. at 614.)

### e.    State Agency Evaluation

On June 24, 2011, state agency physician W. Jerry McCloud, M.D., reviewed the record

and assessed Plaintiff's physical functioning capacity.  Dr. McCloud opined that Plaintiff could

lift and/or carry ten pounds occasionally and frequently; stand and/or walk about two hours in a workday; and sit for about six hours in a workday.  (R. at 149.)  He opined that Plaintiff is limited to frequent stooping; occasional climbing of ramps/stairs, balancing, kneeling, crawling, or crouching; and never climbing ladders, ropes, or scaffolds.  (R. at 150.)  Dr. McCloud also found that Plaintiff is only partially credible because he reported that he cannot sit or stand for any length of time on his activities of daily living form, but at his consultative evaluation, stated he can sit for about 30 minutes and stand for 5 minutes.  (R. at 148-49.)  Dr. McCloud assigned limited weight to Dr. Fouts' opinion because he does not specify postural limitations.  (R. at 149.)  Eli Perencevich, D.O., reviewed Plaintiff's records upon reconsideration on November 7, 2011, and essentially affirmed Dr. McCloud's assessment.  (R. at 178-79.)

### 2. Mental Impairments

#### a. Scioto Paint Valley Mental Health Center

On March 22, 2011, Plaintiff was treated at the crisis center for anxiety, depression, and interpersonal relationship problems.  Plaintiff was referred to group therapy.  (R. at 493.)

#### b. Adena Health System

Plaintiff presented to the emergency room on June 3, 2011, complaining of back pain and suicidal ideations.  He requested a psychiatric evaluation and reported suicidal ideation with thoughts of getting a gun, putting it to his head, and pulling the trigger.  Plaintiff was admitted for crisis stabilization and suicide precautions.  (R. at 563.)  The consulting psychiatrist, Richard F. Huspen, noted that Plaintiff exhibited limited insight, limited judgment, and impaired impulse control.  Dr. Huspen assessed mood disorder, not otherwise specified, with suicidal ideation.  (R. at 564.)  Dr. Huspen opined that Plaintiff's Global Assessment of Functioning ("GAF") score

11

was 35 at the time of intake and 50 at the time of discharge.  (R. at 565.)  Plaintiff was treated

with therapy, and adjustments were made to his psychotropic medications to try to stabilize his

mood and get increased pain relief.  (R. at 565-66.)  Plaintiff was discharged on June 7, 2011.

On August 28, 2011, Plaintiff was again admitted to the emergency room for depression

with suicidal ideation.  (R. at 616-48.)  Dr. Huspen noted that Plaintiff reported poor sleep, pain,

anger, and that he felt "keyed up."  (R. at 618.)  He noted that Plaintiff was suffering from

insomnia, restlessness, weight loss, and decrease in appetite.  He also was noted to have a

depressed, anxious mood and a flat affect.  (R. at 631-33.)  When Plaintiff was discharged, on

August 31, 2011, his mood was noted to be much less depressed, and his affect had increased

and become more appropriate.  (R. at 617.)

### c.      Lari Meyer, Ph.D.

On June 8, 2011, Plaintiff was evaluated by Dr. Meyer for disability purposes.  (R. at

599-612.)  Plaintiff reported being on edge, experiencing anxiety, having daily crying episodes,

feeling worthless, and losing sleep.  He stated that he has been depressed for the last 2 to 3 years.

(R. at 600.)  Plaintiff reported that he performs no housework, no cooking, and changes and

bathes maybe once every 2-3 days.  (R. at 604.)  Plaintiff reported very low energy, very low

appetite, hardly any sleep, no sex drive, and lack of concentration.  (R. at 606.)  Dr. Meyer noted

motoric signs of anxiety and Plaintiff requested to take a break during the evaluation once due to

anxiety.  (R. at 606.)  Dr. Meyer noted mildly impaired long-term memory and moderately

impaired abstraction.  (R. at 609.)  Dr. Meyer assessed major chronic depressive disorder, severe

without psychotic features, and a panic disorder.  She assigned him a GAF score of 50.  (R. at

610.)

Dr. Meyer opined that Plaintiff can understand, remember, and follow instructions in order to complete a basic work task. She noted that he maintained attention and concentration throughout the interview portion of the exam, and was able to respond to both simple and more complex questions in a timely manner. She further noted that Plaintiff did not demonstrate distractibility, and that he demonstrated adequate attention and concentration on the mental status exam. From these results, she concluded that he has the ability to maintain attention and concentration to complete a basic work task. (R. at 610-11.)

Dr. Meyer noted that Plaintiff demonstrated a constricted mood and affect and, at one point during the exam, demonstrated motoric signs of anxiety. Given these findings, she concluded that he would only be able to relate to others, including coworkers and supervisors, on a time-limited one-on-one basis. Dr. Meyer also opined that Plaintiff would demonstrate difficulty if required to relate to multiple people at once or over a sustained period of time. Dr. Meyer further opined that Plaintiff could withstand stress and pressures associated with simple and repetitive tasks only, and would demonstrate symptoms including panic attacks and increased symptoms of depression as more stressful work situations arose. *Id.*

### d.    State Agency Evaluation

On June 21, 2011, after reviewing Plaintiff's medical record, Melanie Bergsten, Ph.D., a state-agency psychologist, assessed Plaintiff's mental condition and opined that Plaintiff had moderate restrictions in his activities of daily living; moderate difficulties in maintaining social functioning; mild difficulties in maintaining concentration, persistence, or pace; with one or two episodes of decompensation of an extended duration. (R. at 147.) She further determined that the evidence did not establish the presence of the "C" criteria. (R. at 148.) Dr. Bergsten gave

13

great weight to Dr. Meyer's opinion.  (R. at 149.)  Dr. Bergsten concluded that Plaintiff should

be limited to superficial contact with others on an infrequent basis due to panic attacks and

symptoms of depression, and that he is able to perform work related tasks in situations where

duties are relatively static and changes can be explained.  (R. at 151.)

On November 5, 2011, state agency psychologist Bonnie Katz, Ph.D., reviewed

Plaintiff's file on reconsideration and found that Plaintiff had moderate restrictions in his

activities of daily living,  social functioning, and in maintaining concentration, persistence, or

pace, with one or two episodes of decompensation of an extended duration.  (R. at 176.)  In

addition to Dr. Bergsten's conclusions, Dr. Katz determined that due to his symptoms of

depression /anxiety and preoccupation with physical complaints, Plaintiff is able to understand,

remember, and complete simple to somewhat complex tasks not requiring him to sustain close

consistent attention to detail over an extended period, in a rather solitary setting without fast-

paced performance pressures.  He also found that Plaintiff is able to make simple decisions.  (R.

at 180.)

## C.      **Appeal Council Documents**

Plaintiff treated with Alicia Grilliot, CNP, at Adena Family Medicine from December

2012 through July 2013.  (R. at 13-44.)  In December 2012, Plaintiff was escorted to the

emergency room due to suicidal thoughts.  (R. at 43.)  During this time, Plaintiff was assessed

with spinal stenosis of the lumbar spine, major depression, numbness and tingling of the leg, and

obesity.  (R. at 13-44.)  He was put back on medication.  *Id.*

The record contains additional treatment notes from Dr. Kiehm, dated January 2013

through May 2013.  (R. at 46-51, 72-84.)  Dr. Kiehm diagnosed Plaintiff with lumbar stenosis,

14

cervical spondylosis with myelopathy, and cervical stenosis. (R. at 81.) Dr. Kiehm noted that

Plaintiff had been losing feeling down both of his legs when he stands and that it gets worse with

activity. (R. at 82.) Dr. Kiehm also noted weakness in Plaintiff's bilateral extremities, bladder

inconsistencies, and difficulty walking. (R. at 82.) In May 2013, Dr. Kiehm gave Plaintiff

suggested courses of treatment: chiropractics, injections, acupuncture, or surgery if it could be

determined that the L2-L4 area was the cause of his symptoms. (R. at 47.) Plaintiff reported that

he wanted to think over his options.

On March 29, 2013, Plaintiff underwent a functional capacity evaluation by Chris Banks,

OTR/L. (R. at 68-71.) Mr. Banks found Plaintiff incapable of even a sedentary range of work.

(R. at 69.) Specifically, Plaintiff was unable to demonstrate the capability to sit at a frequent rate

of 6 hours or stand/walk for more than 15 minutes at a time or more than 2 hours in an 8 hour

day. He found that Plaintiff's lifting capabilities were also significantly limited. (R. at 71.) Mr.

Banks found that Plaintiff's trunk lateral flexion decreased 90%, trunk rotation decreased 90%,

trunk flexion decreased 90%, trunk extension decreased 100%, and bilateral hip internal rotation

decreased 90%. (R. at 69.)

Plaintiff's April 17, 2013 lumbar spine MRI showed similar findings to the June 2011

MRI, with status post L4-S1 fusion, facet arthropathy at L3-L4, some mild to moderate stenosis,

and left greater than right foraminal stenosis. (R. at 66-67.)

## IV.   ADMINISTRATIVE DECISION

On October 26, 2012, the ALJ issued his decision. (R. at 86–102.) The ALJ found that

Plaintiff met the special earnings requirements of the Act on the alleged onset date and continued

to meet those requirements through the date of the decision. (R. at 91.) At step one of the

15

sequential evaluation process,[2] the ALJ found that Plaintiff had not engaged in substantially gainful activity since his alleged onset date of February 15, 2011.  (*Id.*)  At step two, the ALJ found that Plaintiff had the severe impairments best described as status post laminectomy and fusion at L4-5; failed back surgery syndrome; degenerative disc disease of the lumbar spine; obesity; major depression; and a panic disorder.  (*Id.*)  At step three, he found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments described in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (R. at 91-94.)  At step four, the ALJ set forth Plaintiff's residual functional capacity ("RFC") as follows:

> [Plaintiff] has the [RFC] to lift and carry 10 pounds occasionally, sit for a total of six hours in an eight-hour workday, and stand and walk for a total of two hours in an eight-hour workday.  He cannot climb ladders, ropes, and scaffolds. He can frequently stoop and can occasionally climb ramps and stairs, balance, kneel, crouch, or crawl. Mentally, he can perform simple repetitive tasks not involving a fast work pace.  He can have occasional contact with others, but would be best suited for solitary work. He can maintain attention and concentration for two-hour segments for simple repetitive work.

---

[2] Social Security Regulations require ALJs to resolve a disability claim through a five-step sequential evaluation of the evidence.  *See* 20 C.F.R. § 416.920(a)(4).  Although a dispositive finding at any step terminates the ALJ's review, *see Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), if fully considered, the sequential review considers and answers five questions:

1.  Is the claimant engaged in substantial gainful activity?
2.  Does the claimant suffer from one or more severe impairments?
3.  Do the claimant's severe impairments, alone or in combination, meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments, 20 C.F.R. Subpart P, Appendix 1?
4.  Considering the claimant's residual functional capacity, can the claimant perform his or her past relevant work?
5.  Considering the claimant's age, education, past work experience, and residual functional capacity, can the claimant perform other work available in the national economy?

*See* 20 C.F.R. § 416.920(a)(4); *see also Henley v. Astrue*, 573 F.3d 263, 264 (6th Cir. 2009); *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

(R. at 94.)  The ALJ found Plaintiff's statements concerning the presence of incapacitating discomfort and associated functional limitations not fully credible.  (R. at 96-99.)  In determining Plaintiff's RFC, the ALJ gave "great weight" to the opinions of the state-agency physicians and psychologists.  (R. at 95.)  The ALJ assigned "very little" weight to Dr. Fouts' opinions, and "some weight" to the opinions of Dr. Whitehead, Dr. Kiehm, and Dr. Meyer.  (R. at 95.)

At step four, relying on the VE's testimony, the ALJ concluded that Plaintiff is unable to perform any past relevant work.  At step five, he found that Plaintiff can, however, perform jobs that exist in significant numbers in the national economy.  (R. at 100-01.)  The ALJ therefore concluded that Plaintiff was not disabled under the Social Security Act.  (R. at 101.)

## V.    STANDARD OF REVIEW

When reviewing a case under the Social Security Act, the Court "must affirm the Commissioner's decision if it 'is supported by substantial evidence and was made pursuant to proper legal standards.'"  *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)); *see also* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . .").  Under this standard, "substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Rogers*, 486 F.3d at 241 (quoting *Cutlip v. Sec'y of Health & Hum. Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).

Although the substantial evidence standard is deferential, it is not trivial.  The Court must "'take into account whatever in the record fairly detracts from [the] weight'" of the Commissioner's decision.  *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (quoting

17

*Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)). Nevertheless, "if substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'" *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)). Finally, even if the ALJ's decision meets the substantial evidence standard, "'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007)).

## VI.    ANALYSIS

Plaintiff asks the Court to reverse the ALJ's nondisability finding for several reasons. First, Plaintiff asserts that the ALJ erred in refusing to give controlling weight to the opinion of treating physician, Dr. Fouts. Plaintiff also contends that the ALJ erred at step two by failing to discuss Plaintiff's bipolar disorder, spasms and fall risk, sleep problems, degenerative osteoarthritis in the left knee, and degenerative osteoarthritis in the left foot. Plaintiff further contends that the ALJ erred at step three in finding that Plaintiff's mental impairments do not meet or equal Listings 12.04 or 12.06. Finally, Plaintiff posits that the ALJ erred in giving great weight to the state agency medical consultants' opinions. Alternatively, Plaintiff seeks a sentence six remand so that the ALJ can evaluate new and material evidence.

For the reasons that follow, the Undersigned **RECOMMENDS** that this case be **REVERSED** and **REMANDED** to the Commissioner for the ALJ's failure to consider the

record as a whole in weighing Dr. Fouts' opinions related to Plaintiff's physical limitations.[3]

The ALJ must consider all medical opinions that he or she receives in evaluating a claimant's case. 20 C.F.R. § 416.927(c). The applicable regulations define medical opinions as "statements from physicians . . . that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions." 20 C.F.R. § 416.927(a)(2).

The ALJ generally gives deference to the opinions of a treating source "since these are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [a patient's] medical impairment(s) and may bring a unique prospective to the medical evidence that cannot be obtained from the objective medical filings alone . . . ." 20 C.F.R. § 416.927(c)(2); *Blakley*, 581 F.3d at 408. If the treating physician's opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in [the claimant's] case record, [the ALJ] will give it controlling weight." 20 C.F.R. § 404.1527(c)(2).

If the ALJ does not afford controlling weight to a treating physician's opinion, the ALJ must meet certain procedural requirements. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004). Specifically, if an ALJ does not give a treating source's opinion controlling weight:

> [A]n ALJ must apply certain factors—namely, the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion

---

[3]This finding obviates the need for in-depth analysis of Plaintiff's remaining assignments of error, including the ALJ's assessment of Dr. Fouts' opinions related to Plaintiff's mental abilities and limitations. Thus, the Undersigned need not, and does not, resolve the alternative bases Plaintiff asserts to support reversal and remand. Nevertheless, on remand, the ALJ may consider Plaintiff's remaining assignments of error if appropriate.

with the record as a whole, and the specialization of the treating source—in determining what weight to give the opinion.

*Id*.  Furthermore, an ALJ must "always give good reasons in [the ALJ's] notice of determination or decision for the weight [the ALJ] give[s] your treating source's opinion."  20 C.F.R. § 416.927(c)(2).  Accordingly, the ALJ's reasoning "must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight."  *Friend v. Comm'r of Soc. Sec.*, No. 09-3889, 2010 WL 1725066, at *7 (6th Cir. Apr. 28, 2010) (internal quotation omitted).  The United States Court of Appeals for the Sixth Circuit has stressed the importance of the good-reason requirement:

> "The requirement of reason-giving exists, in part, to let claimants understand the disposition of their cases," particularly in situations where a claimant knows that his physician has deemed him disabled and therefore "might be especially bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied."  *Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir.1999). The requirement also ensures that the ALJ applies the treating physician rule and permits meaningful review of the ALJ's application of the rule. *See Halloran v. Barnhart*, 362 F.3d 28, 32–33 (2d Cir. 2004).

*Wilson*, 378 F.3d at 544–45.  Thus, the reason-giving requirement is "particularly important when the treating physician has diagnosed the claimant as disabled."  *Germany-Johnson v. Comm'r of Soc. Sec.*, 312 F. A'ppx 771, 777 (6th Cir. 2008) (citing *Rogers*, 486 F.3d at 242).

There is no requirement, however, that the ALJ "expressly" consider each of the *Wilson* factors within the written decision.  *See Tilley v. Comm'r of Soc. Sec.*, No. 09-6081, 2010 WL 3521928, at *6 (6th Cir. Aug. 31, 2010) (indicating that, under *Blakley* and the good reason rule, an ALJ is not required to explicitly address all of the six factors within 20 C.F.R. § 404.1527(c)(2) for weighing medical opinion evidence within the written decision).

Here, the ALJ acknowledged that Dr. Fouts, Plaintiff's primary care physician, is a

treating source.  The ALJ found, however, that Dr. Fouts' opinion was not entitled to controlling

weight and ultimately assigned "very little weight" to his opinions, explaining as follows:

> Dr. Fouts has submitted three medical source statements, all of which would
> support a finding of disability.  Dr. Fouts appears to qualify as a treating source
> within the meaning of the regulations, as there is a treatment relationship dating
> back to 2007 (Exhibit 19F).  The regulations further provide that a treating source
> opinion is entitled to controlling weight where it is well supported by and not
> inconsistent with objective clinical and laboratory findings.
>
> I do not assign controlling weight to any of these statements.  First, I note that Dr.
> Fouts is a primary care physician and is not a specialist in occupational medicine,
> physical medicine or rehabilitation or in orthopedics or neurology.  The absence
> of any specialized training is a factor to be considered in determining weight of
> medical source opinions.
>
> Rather, [] very little weight is given to the opinions dated February 6, 2012
> (Exhibit 35F) and February 8, 2012 (Exhibit 36F), as these opinions (i.e. sitting,
> standing, and walking less than four hours and having to lie down up to four hours
> in an eight-hour day) are more restrictive than the totality of the medical evidence
> suggests.  Such a conclusion is inconsistent with his own treatment notes at
> Exhibits 34F and 37F.  Further, the final responsibility to determine whether a
> [Plaintiff] is "disabled" or "unable to work" is reserved for the Commissioner
> pursuant to 20 CFR 404.1527(e) and 416.927(e).  For these reasons I also assign
> little weight to the conclusory statements dated April 25, 2011 (Exhibit 19F p. 2),
> as the opinion is inconsistent with the totality of the medical evidence of the
> record and other credible medical opinions as noted herein.  Moreover, the doctor
> failed to provide a function-by-function analysis that specified specific abilities.

(R. at 95-96.)

As Plaintiff points out, it is inappropriate to reject a treating physician's opinion because

he is not a specialist.   *See* 20 C.F.R. § 404.1527(c)(2) (explaining that if a treating source's

opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques

and is not inconsistent with other substantial evidence in [the claimant's] case record, [the ALJ]

will give it controlling weight.").   Here, however, the ALJ also stated that Dr. Fouts' opinions

are inconsistent with the totality of the evidence in the record, including his own treatment notes.

This is a valid reason, if supported by substantial evidence, for declining to afford controlling weight to a treating source's opinion.

Nevertheless, while, in theory, the ALJ provided an adequate reason for rejecting Dr. Fouts' opinions dated February 6, 2012 and February 8, 2012[4] as controlling, this reason is not supported by substantial evidence in the record.[5] When explaining the weight assigned to Dr. Fouts' opinions, the ALJ explained that Dr. Fouts' February 6, 2012 and February 8, 2012 opinions are more restrictive than the totality of the medical evidence suggests and inconsistent with his own treatment notes. The ALJ fails, however, to point to specific inconsistencies. Nonetheless, in looking at the decision as a whole, the Undersigned can glean the evidence upon which the ALJ relied in discounting Dr. Fouts' opinions. For example, in his discussion of Plaintiff's credibility, the ALJ stated as follows:

> Regarding overall credibility, the evidence fails to document that the [Plaintiff] has demonstrated most of the signs typically associated with chronic, severe pain,

[4]The ALJ also discounts Dr. Fouts' April 25, 2011 opinion because he found it to be inconsistent with the medical evidence in the record and because Dr. Fouts' did not provide a function-by-function analysis of Plaintiff's abilities. As explained below, the ALJ's conclusion that Dr. Fouts' opinions are inconsistent with the medical evidence is not supported by substantial evidence. Further, "there is no requirement in the regulations or Social Security Rulings that a medical source opinion must provide a 'function by function' analysis, nor does the lack of such an analysis provide a proper basis for an opinion's outright rejection." *Farris v. Comm'r of Soc. Sec.*, 1:11-CV-258, 2012 WL 1552634, at *13 (S.D. Ohio Apr. 30, 2012) *report and recommendation adopted sub nom. Farris v. Comm'r of Soc. Sec.*, 1:11-CV-258, 2012 WL 1884232 (S.D. Ohio May 22, 2012). Nevertheless, an ALJ is not bound by medical opinions that are conclusory in nature. *See Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir. 2001) ("[T]he ALJ "is not bound by conclusory statements of doctors, particularly where they are unsupported by detailed objective criteria and documentation.")

[5]The Undersigned acknowledges that the ALJ reasonably rejected Dr. Fouts' conclusions that Plaintiff is disabled and unable to work because such determinations are specifically reserved to the Commissioner. *Bass v. McMahon*, 499 F.3d 506, 511 (6th Cir. 2007) (holding that the ALJ properly rejected a treating source's opinion that the claimant was disabled because such a determination was reserved to the Commissioner). Dr. Fouts, however, provided additional opinions regarding Plaintiff's capabilities and limitations that were entitled to weight.

22

such as muscle atrophy, rigidity, or tremor.  There is no evidence of persistent neurological deficits; for example, while Dr. Whitehead noted some evidence of lower extremity weakness and sensory loss, there was no reference to reflex changes.  When treated for leg pain after a fall in May 2011, the [Plaintiff] had no sensory or motor deficits and ambulated without assistance on discharge.  When treated for complaints of back pain in September 2011 he ambulated without assistance upon discharge.  Imaging studies have failed to reveal significant pathology in weight-bearing joints.  While studies have shown post-surgical changes in the lumbar spine, [] [c]linical examinations have not identified signs of inflammatory disease, nor is there evidence of other signs that might be expected in the presence of a truly debilitating impairment, such as bowel or bladder dysfunction.

The record shows that the [Plaintiff] consistently has negative straight leg raise bilaterally and walks with a normal gait and posture without the use of ambulatory aids.

(R. at 97-98 (internal citations omitted).)  The ALJ also found that Plaintiff's complaints of disabling pain are inconsistent with his overall medical regimen and activities of daily living. *Id.*

A review of the ALJ's discussion of the objective evidence demonstrates that the ALJ failed to consider the entire record in assessing whether Dr. Fouts' opinions were entitled to controlling weight.  Rather than focusing on the signs and symptoms that Plaintiff exhibited upon medical examination, the ALJ points to all the signs and symptoms that were not present.  In doing so, the ALJ attempts to use the purported lack of evidence to conclude that Plaintiff is not credible and that Dr. Fouts' opinions are inconsistent with the objective evidence in the record.  In doing so, however, the ALJ misstated some important evidence and improperly failed to consider other evidence.

For example, in his decision, the ALJ failed to acknowledge that Plaintiff's treatment notes indicate that examination revealed bilateral lower paraspinal muscle tenderness, severely reduced lumbar flexion, severely reduced lumbar extension, decreased sensation in the right

anterior lateral thigh, decreased range of motion, reduced left knee flexion, midline tenderness, decreased strength, and radiculopathy.  (R. at 550-51, 683, 687, 701, 722, 725, 729, 732, 735, 738, 741, 749, 762.)

Further, in his decision, the ALJ states that "[i]maging studies have failed to reveal significant pathology in weight-bearing joints."  (R. at 98.)  The ALJ then fails to discuss that the imaging studies *did* reveal postsurgical changes and decompressed laminectomies spanning L4-S1; moderate spinal canal stenosis and mild bilateral neural foraminal narrowing at L3-L4 secondary to grade 1 retrolisthesis of L3 relative to L4; a disc bulge; facet arthropathy and thickening of the ligamentum flavum; mild to moderate left neural foraminal narrowing at L5-S1 secondary to grade 1 anterolisthesis of L5 relative to S1; and a disc bulge at T11-T12 without significant spinal canal stenosis.  (R. at 559-60.)  Additionally, the ALJ does not acknowledge that Dr. Kiehm informed Plaintiff that he would likely have back pain for the rest of his life, even if he had surgery, (R. at 454), or that she noted that Plaintiff cannot stand for more than 10 minutes at a time as a result of his back pain.  (R. at 471.)  The above-stated evidence constitutes relevant "evidence" under 20 C.F.R. § 404.1512 that is it be considered by the ALJ. Accordingly, the ALJ should have explained why this evidence was ignored.  *See Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 379 (6th Cir. 2013) (finding that where the ALJ discounted a treating source's opinions "largely due to their alleged lack of consistency with the record as a whole," some explanation should have been given for failing to discuss a large portion of evidence that lent support to the treating source's opinions).

Additionally, the ALJ misstated some important evidence.  For example, the ALJ states that Plaintiff consistently has negative straight-leg raise bilaterally and walks with a normal gait.

24

This finding, however, ignores consultative examiner Dr. Whitehead's findings that (1) Plaintiff walked with a "forward flexed antalgic gait with a very short swing bilaterally" and (2) Plaintiff had positive straight leg raise bilaterally in the seated position at 40 degrees.  (R. at 550-51.)  It also ignores Dr. Fouts' finding, on more than one occasion, that Plaintiff had positive straight leg raise at 30 degrees on his right side.  (R. at 759, 756, 765.)  Accordingly, given the inconsistencies between the ALJ's *own* findings and the record evidence, this case must be remanded for further fact finding and weighing of the medical opinions.

In her Memorandum in Opposition, the Commissioner's only argument in support of the ALJ's rejection of Dr. Fouts' opinions as controlling is as follows:

> In February 2012, Dr. Fouts prepared two medical source statements, finding Plaintiff experienced extreme limitations.  As the ALJ pointed out, these limitations were not consistent with Dr. Fouts' own treatment notes.  For example, Dr. Fouts opined that Plaintiff could lift 5 pounds occasionally, but progress notes indicated Plaintiff rated his pain at just "4-5/10."  Physical examinations noted some tenderness and reduced flexion/reduced extension, but otherwise benign findings.  Plaintiff also previously reported that he could "only lift 15-20" pounds, drive a car, and shop in stores.  Dr. Fouts' opinions were simply inconsistent with other substantial evidence.

(Def.'s Mem. in Opp. 5, ECF No. 18.)  Thus, the Commissioner's *post hoc* rationalizations also fail to consider the full record and do not provide any additional insight into how Dr. Fouts' opinions are inconsistent with the record.  The Undersigned therefore cannot conclude that substantial evidence supports the weight assigned to Dr. Fouts' opinions and the ALJ's ultimate nondisability finding.  Further, the ALJ's violation of the treating source rule was not harmless error.  *See Wilson,* 378 F.3d at 547 (finding harmless error where the treating source's opinion was patently deficient, where the ALJ's decision was consistent with the treating source's opinion, or where the ALJ's decision met the goal of *Wilson's* good reason requirement).

25

On remand, a proper analysis of the entire record might not support giving controlling weight to the opinions of Dr. Fouts. Even if Dr. Fouts' opinions are not entitled to controlling weight, they must still be weighed in accordance with the prescribed regulations. *Gayheart*, 710 F.3d at 380. Given the nature of his treatment relationship with Plaintiff, his detailed treatment notes, and the supportability and consistency of his opinions with the record evidence, an ALJ must provide a more detailed explanation, supported by substantial evidence, before assigning Dr. Fouts' opinions "very little weight."

In sum, in weighing the medical evidence, the ALJ failed to consider portions of the record and mischaracterized other evidence in the record. Remand is therefore appropriate. This finding obviates the need for in-depth analysis of Plaintiff's remaining assignments of error. Thus, the Court does not resolve the alternative bases Plaintiff asserts to support reversal and remand. The Court notes, however, that Plaintiff raises additional contentions of error that may have merit. Accordingly, the Commissioner may consider the remaining contentions of error, if appropriate, on remand.

## VII. CONCLUSION

Due to the errors outlined above, Plaintiff is entitled to an order remanding this case to the Social Security Administration pursuant to Sentence Four of 42 U.S.C. § 405(g). Accordingly, the Undersigned **RECOMMENDS** that the Court **REVERSE** the Commissioner of Social Security's non-disability finding and **REMAND** this case to the Commissioner and the ALJ under Sentence Four of § 405(g) for further consideration consistent with this Report and Recommendation.

## VIII.    PROCEDURE ON OBJECTIONS

If any party seeks review by the District Judge of this Report and Recommendation, that party may, within fourteen (14) days, file and serve on all parties objections to the Report and Recommendation, specifically designating this Report and Recommendation, and the part in question, as well as the basis for objection.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). Response to objections must be filed within fourteen (14) days after being served with a copy. Fed. R. Civ. P. 72(b).

The parties are specifically advised that the failure to object to the Report and Recommendation will result in a waiver of the right to *de novo* review by the District Judge and waiver of the right to appeal the judgment of the District Court.  *See, e.g.*, *Pfahler v. Nat'l Latex Prod. Co.*, 517 F.3d 816, 829 (6th Cir. 2007) (holding that "failure to object to the magistrate judge's recommendations constituted a waiver of [the defendant's] ability to appeal the district court's ruling"); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005) (holding that defendant waived appeal of district court's denial of pretrial motion by failing to timely object to magistrate judge's report and recommendation).  Even when timely objections are filed, appellate review of issues not raised in those objections is waived.  *Robert v. Tesson*, 507 F.3d 981, 994 (6th Cir. 2007) ("[A] general objection to a magistrate judge's report, which fails to specify the issues of contention, does not suffice to preserve an issue for appeal . . . .") (citation omitted)).

Date: August 7, 2015                                    */s/ Elizabeth A. Preston Deavers*
                                                                Elizabeth A. Preston Deavers
                                                                United States Magistrate Judge